SCOTT A. FLETCHER,                      )
                                        )
                    Plaintiff,          )
                                        )
        v.                              )        No.  4:13CV2064 TIA
                                        )
CAROLYN W. COLVIN, Acting               )
Commissioner of Social Security,        )
                                        )
                    Defendant.          )

## MEMORANDUM AND ORDER

Plaintiff Scott A. Fletcher brings this action under 42 U.S.C. §§ 405(g) and

1383(c)(3) for judicial review of the Commissioner's final decision denying his

application for disability insurance benefits (DIB) under Title II of the Social

Security Act, 42 U.S.C. §§ 401, *et seq.*, and application for supplemental security

income (SSI) under Title XVI of the Act, 42 U.S.C. §§ 1381, *et seq.*  All matters

are pending before the undersigned United States Magistrate Judge, with consent

of the parties, pursuant to 28 U.S.C. § 636(c).  Because the final decision is not

supported by substantial evidence on the record as a whole, it is reversed.

### I.  Procedural History

On September 2, 2010, the Social Security Administration denied plaintiff's

July 1, 2010, applications for DIB and SSI in which he claimed he became

disabled on June 30, 2009, because of thyroid disease; severe swelling in his hands, joints, back, and both shoulders; inflammation in the right ankle and big toe; sleep apnea; borderline diabetes; borderline high blood pressure; heart problems and irregular heart rate; depression; and hearing voices. (Tr. 118-19, 121-25, 173-88, 215.) Plaintiff subsequently amended his alleged onset date to June 29, 2010. (Tr. 209.) At plaintiff's request, a hearing was held before an administrative law judge (ALJ) on November 7, 2011, at which plaintiff and a vocational expert testified. (Tr. 70-117.) On March 23, 2012, the ALJ issued a decision denying plaintiff's claims for benefits, finding vocational expert testimony to support a finding that plaintiff is able to perform light work as it exists in significant numbers in the national economy. (Tr. 52-66.) On August 15, 2013, after considering additional evidence, the Appeals Council denied plaintiff's request for review of the ALJ's decision. (Tr. 1-6.) The ALJ's determination thus stands as the final decision of the Commissioner. 42 U.S.C. § 405(g).

In this action for judicial review, plaintiff claims that the final decision is not supported by substantial evidence on the record as a whole, arguing that the ALJ erred in determining his residual functional capacity (RFC) by failing to include the effects of his thyroid condition, and specifically, fatigue. Plaintiff also contends that the ALJ's physical RFC assessment is inconsistent with the medical opinion rendered by consulting physician, Dr. Mannis; and, further, that the

vocational expert's testimony regarding plaintiff's ability to perform work was incompatible with plaintiff's upper extremity limitations. Plaintiff also appears to challenge the ALJ's findings regarding his credibility. For the reasons that follow, the final decision is reversed and the matter shall be remanded to the Commissioner for further proceedings.[1]

## II. Relevant Testimonial Evidence Before the ALJ

A.  Plaintiff's Testimony

At the hearing on November 7, 2011, plaintiff testified in response to questions posed by the ALJ and counsel.

At the time of the hearing, plaintiff was forty-five years of age. Plaintiff stands five feet, nine inches tall and weighs 230 pounds. Plaintiff is right-handed. Plaintiff completed ten years of school and obtained his GED. (Tr. 74.) Plaintiff is not married. He lives with his girlfriend and her twenty-nine-year-old son. Plaintiff's girlfriend is disabled because of rheumatoid arthritis. (Tr. 83-84.)

Plaintiff's Work History Report shows that plaintiff worked as a janitor from October 1994 to February 2004 and again in 2006. From October 2004 to January 2006, plaintiff worked as a bus aide for school transportation. From December 2004 to 2007, plaintiff worked as a driver for the St. Louis Society for Children.

---

[1] The undersigned has reviewed the entirety of the administrative record in determining whether the Commissioner's adverse decision is supported by substantial evidence. The recitation of specific evidence in this Memorandum and Order, however, is limited to only that relating to the issues raised by plaintiff on this appeal.

From March 2006 to May 2007, plaintiff worked as an air cargo laborer. Plaintiff worked again as a janitor from May 2007 to June 30, 2009. (Tr. 239.) Plaintiff testified that he stopped working in June 2009 because his contract for employment expired; his employer was going to move him to another location, which was too far away for him; and his pay was going to be reduced. Plaintiff testified that he was also starting to become sick at that time. (Tr. 76-77.) Plaintiff applied for unemployment benefits and looked for light jobs that he thought he could perform – such as cashier, but he was unsuccessful in obtaining employment. (Tr. 97-98.)[2]

Plaintiff testified that he was suffering from fatigue as well as soreness in his left shoulder, fingers, and right ankle when he stopped working in 2009. Plaintiff testified that his condition has since worsened in that he currently experiences worsening pain in his hands and new pain in his left ankle and right shoulder. Plaintiff testified that he experiences inflammation, stiffness, and weakness in the affected joints. (Tr. 77-78.) Plaintiff testified that he sees doctors for his conditions and was told that he has hyperthyroidism and arthritis. Plaintiff takes Naproxen and hydrocodone for inflammation and Vicodin for pain. Plaintiff takes Levothyroxine for his thyroid condition. (Tr. 79-80.) Plaintiff experiences fatigue,

---

[2] The record shows plaintiff to have received unemployment benefits during the first quarter of 2010. (Tr. 207-08.)

dizziness, and drowsiness because of his medications.  (Tr. 97.)

Plaintiff testified that he has experienced fatigue since 2007 and that it has worsened over the years.  Plaintiff testified that he was nearly fired from his job in 2008 because he fell asleep.  Plaintiff began seeing a thyroid specialist when his fatigue worsened.  (Tr. 81.)  Plaintiff testified that he now becomes fatigued after taking his medication in the morning and lies down throughout the day because he is tired all of the time.  Plaintiff sleeps three and a half to four hours during the day and five or six hours at night.  Plaintiff is able to sleep only in spurts because of his pain.  (Tr. 95-96.)

Plaintiff reported that he has experienced worsening problems in his left shoulder since late 2007 or early 2008.  Plaintiff testified that he went to the emergency room at that time because his friend suspected that the numbness and weakness in his arm was on account of a heart attack.  (Tr. 82-83.)

As to his exertional abilities, plaintiff testified that he is limited to being on his feet for less than thirty minutes at a time because of pain in his knees and ankles.  Plaintiff testified that he experiences more problems on the right side than the left, but he has problems with his left knee and ankle because he overcompensates.  (Tr. 84-85.)  Plaintiff testified that he can lift and carry a plate of food.  He can lift a gallon of milk with both hands but cannot carry it.  Plaintiff can carry a grocery bag if it contains only two or three cans.  (Tr. 87.)

As to his daily activities, plaintiff testified that watches television and listens to the radio. Plaintiff occasionally reads the sports page from the newspaper. (Tr. 88.) Plaintiff does not cook or go to the grocery store. Plaintiff testified that if he were to go to the store, he uses motorized cart and does not walk through the store. (Tr. 86-87.) Plaintiff cannot do household chores such as vacuuming because of his limited mobility and range of motion. His girlfriend's son performs the daily household chores. (Tr. 84.) Plaintiff can do the dishes "a little bit." (Tr. 86.) He no longer drives because of fatigue. (Tr. 99.)

B.    Testimony of Vocational Expert

Debora Detterman, a vocational rehabilitations consultant, testified at the hearing in response to questions posed by the ALJ and counsel.

Ms. Detterman classified plaintiff's past work as a janitor as medium but testified that light janitorial jobs exist. Ms. Detterman also classified plaintiff's past work as a bus monitor and van driver as light and medium work, respectively, but very heavy as plaintiff performed the jobs. (Tr. 105.)

The ALJ asked Ms. Detterman to assume that plaintiff was limited to light work, could occasionally lift twenty pounds but nothing greater, could frequently lift up to ten pounds, and could be on his feet standing and walking the better part of a day. Ms. Detterman testified that such a person could work in housekeeping at hotels or as an office cleaner, of which 2,200 such jobs exist in the State of

Missouri and 50,000 nationally; and as an airport transport driver, of which twenty-five such jobs exist in the State of Missouri.  (Tr. 106-07.)

The ALJ then asked Ms. Detterman to assume that, in addition to the lifting restrictions, plaintiff would need to change positions such that he could sit for half an hour to forty-five minutes and stand for up to half an hour and would need to alternate positions within those time frames.  Ms. Detterman testified that the jobs to which she previously testified would be eliminated.  She testified, however, that there were other light, unskilled jobs that plaintiff could perform, and specifically, information clerk, of which 1,200 such jobs exist in the State of Missouri and 78,000 nationally; storage facility rental clerk, of which 400 such jobs exist in the State of Missouri and 20,000 nationally; and office helper, of which 600 such jobs exist in the State of Missouri and 50,000 nationally.  (Tr. 108-09.)

The ALJ then asked Ms. Detterman to assume plaintiff to be further limited by fatigue in that he would have difficulty focusing on what he was doing and would have to take unscheduled rest periods during the day.  Ms. Detterman testified that such limitations would preclude all competitive employment.  (Tr. 109.)

The ALJ then asked Ms. Detterman to assume that, without considering the fatigue factor, plaintiff had limited use of the hands in that he could only occasionally or intermittently use his hands for ongoing repetitive activities.  Ms.

Detterman testified that plaintiff could perform light work as a counter clerk, of which 350 such jobs exist in the State of Missouri; furniture rental clerk, of which 450 such jobs exist in the State of Missouri and 25,000 nationally; and tanning salon attendant, of which 250 such jobs exist in the State of Missouri and 8,000 nationally. (Tr. 109-11.)

Counsel asked Ms. Detterman to assume that plaintiff was restricted to occasional lifting of ten pounds; frequently lifting less than ten pounds; standing or walking at least two hours in an eight-hour day; being able to sit for six hours in an eight-hour day; and only occasionally climbing ladders, ropes, or scaffolds. Ms. Detterman testified that plaintiff would not be able to perform the light exertional work to which she previously testified. Ms. Detterman testified that such preclusion would continue if plaintiff also had limited use of his hands. (Tr. 112-13.)

Counsel then asked Ms. Detterman to assume that plaintiff had an additional limitation of being able to only occasionally reach, handle, and finger, to which Ms. Detterman testified that plaintiff could perform sedentary work as a call-out operator, of which 95 such jobs exist in the State of Missouri and 13,000 nationally; and surveillance system monitor, of which 45 such jobs exist in the State of Missouri and 2,800 nationally. Ms. Detterman testified that there are no sedentary, unskilled jobs listed in the *Dictionary of Occupational Titles* (DOT)

where reaching, handling, and fingering are not part of the job.  (Tr. 113-14.)

### III.  Relevant Medical Evidence Before the ALJ

In this action, plaintiff alleges a disability onset date of June 29, 2010.

Plaintiff was admitted to the emergency room at BJC on December 11, 2008, with complaints of chest pain and left arm pain.  Plaintiff reported the pain to feel more musculoskeletal in nature.  Plaintiff was noted to have previously been diagnosed with hypothyroidism and hyperlipidemia.  Plaintiff reported that he took no medications.  Physical examination showed normal range of motion about all the extremities.  Plaintiff was admitted for cardiac monitoring and was discharged the following day.  (Tr. 279-310.)

Plaintiff visited the Myrtle H. Davis Health Center (MDHC) on May 22, 2009, for medication refills, including Levothyroxine.  No complaints were noted. (Tr. 343-44.)

Plaintiff visited Dr. Olivera Boskovska at MDHC on June 18, 2009, with complaints of left shoulder and arm pain.  Plaintiff reported having the pain for about six months and that he was taking his girlfriend's Vicodin.  Plaintiff also reported having pain in his right foot for several months.  Examination of the left shoulder was normal, except plaintiff reported pain with internal rotation.  Plaintiff was diagnosed with rotator cuff tenderness and was referred to orthopedics. Plaintiff was instructed to take over-the-counter Tylenol for pain and was advised

that Vicodin was not indicated for the condition. Examination of the right foot showed tenderness to touch below the lateral malleolus. An x-ray of the foot showed hypertrophy of the first metatarsal head with moderate hallux valgus, moderate pes planus configuration, and a prominent bone spur at the dorsal aspect of the first metatarsal head. Plaintiff was referred to podiatry. (Tr. 340-41, 350.)

During an emergency room visit on November 7, 2009, for complaints relating to bronchitis, it was noted that plaintiff's current medications included Levothyroxine. Plaintiff had no complaints of joint pain or myalgia. Musculoskeletal examination showed normal range of motion in all extremities. (Tr. 311, 315-16.)

Plaintiff returned to Dr. Boskovska on January 20, 2010, for a refill of Levothyroxine. Dr. Boskovska determined to test plaintiff's TSH levels first inasmuch as plaintiff had been without his medication for more than four or five months. (Tr. 339.)[3]

Plaintiff visited Dr. Boskovska on February 16, 2010, with complaints of left shoulder pain. Plaintiff reported that taking Aleve did not help the pain. Plaintiff reported his energy to be "better" but that he "never felt without energy." Plaintiff was noted to be taking Levothyroxine. Plaintiff was diagnosed with rotator cuff

---

[3] Pharmaceutical records submitted to and considered by the Appeals Council after the ALJ's decision shows plaintiff to have regularly picked up his prescriptions for Levothyroxine between June 2009 and January 2010. (*See* Tr. 198-99.)

tendonitis and was instructed to take over-the-counter Aleve. An x-ray taken of the left shoulder showed a small calcified loose body at the upper area of the left scapula-humeral joint. (Tr. 336-38, 348.)

Plaintiff returned to Dr. Boskovska on May 27, 2010, and reported that he was experiencing a rapid heartbeat. Plaintiff reported feeling "fine" and did not understand why his thyroid labs were "so much abnormal." Plaintiff's only medication was noted to be Flonase. Plaintiff reported having no pain. Thyroid labs were ordered, and plaintiff was instructed to see an endocrinologist. Levothyroxine was prescribed. (Tr. 331-33.)

A thyroid ultrasound performed on June 15, 2010, showed thyromegaly. (Tr. 347.)

Plaintiff returned to Dr. Boskovska on July 28, 2010, and complained that all of his joints hurt in the morning and that he continued to have pain in his left shoulder. Plaintiff also reported that he sometimes had difficulty walking and needed a cane. Plaintiff reported Aleve not to help his pain. Plaintiff also reported that his heart sometimes beats fast and he feels nervous. He questioned whether his thyroid medication was too strong. Examination showed plaintiff to have no joint deformities about the hands, and he had full range of motion. Abduction of the left arm elicited pain about the shoulder. Plaintiff was referred to orthopedics for evaluation of the loose body in the left shoulder. Dr. Boskovska ordered

laboratory testing for concern regarding arthritis given the demonstrated arthralgia in multiple sites. Tramadol was prescribed. A referral to rheumatology would be made upon receipt of the lab results. Dr. Boskovska decreased plaintiff's dosage of Levothyroxine. (Tr. 356-58.)

On September 22, 2010, plaintiff complained to Dr. Boskovska that Tramadol and Tylenol did not help his pain. Plaintiff reported that he had to stop working in January 2010 because of pain in his left shoulder, arm, and left ankle. Dr. Boskovski noted plaintiff to have an upcoming orthopedic appointment scheduled for his shoulder. Plaintiff reported that he has also had pain in his right ankle for three years and that the pain was worsening. Plaintiff reported experiencing pain with sitting for a long time and that it takes time for him to start walking because of occasional difficulty putting pressure on his foot. Plaintiff also reported recent swelling of his right hand, with such swelling to have resolved after two days. Plaintiff's current medications of Levothyroxine and Tramadol were refilled, and laboratory testing was ordered. (Tr. 441-43.)

On November 3, 2010, plaintiff complained to Dr. Boskovska that he had pain in both of his shoulders. No other complaints were noted. A new diagnosis of type II diabetes mellitus was assessed. Plaintiff's dosage of Levothyroxine was increased. (Tr. 437-39.)

Plaintiff visited Dr. David Keiffer on November 8, 2010, for complaints of

osteoarthritis in the left shoulder as well as complaints of pain in the right shoulder, both hands, and both ankles. Examination of the shoulders showed abnormalities, including muscle spasm, abnormal motion, pain with motion, weakness, and abnormality in the glenohumeral joint. Dr. Kieffer diagnosed plaintiff with shoulder impingement, right and left rotator cuff tendonitis, and subacromial bursitis. Plaintiff was instructed to engage in regular exercise. Plaintiff was prescribed Darvocet, and an MRI was ordered. (Tr. 431-32.)

On November 19, 2010, plaintiff visited Dr. Henry Bradford, a podiatrist, for diabetes follow up and right ankle pain. Examination showed excessive pronation of both feet with right medial subtalar joint pain. Pes planus of both feet was also noted. Dr. Bradford's diagnoses included flat foot. Foot orthotics were recommended, and plaintiff was instructed to return in January for orthotics casting. (Tr. 422-24.)

Plaintiff visited Dr. Arnold Brody, an endocrinologist, on December 2, 2010. Plaintiff reported not feeling tired or poorly, not feeling fatigued, not tiring easily, no lethargy, and no sudden exhaustion. Dr. Brody noted plaintiff's TSH levels to have been elevated and that thyromegaly was noted on ultrasound. Physical examination was essentially normal, including normal musculoskeletal examination. Laboratory tests were ordered. Plaintiff was instructed to increase his dosage of Levothyroxine. (Tr. 416, 419-20.)

On January 6, 2011, plaintiff reported to Dr. Brody that he felt good. Plaintiff was instructed to continue with his medications and to return in six weeks. (Tr. 411.)

Plaintiff visited Dr. Kieffer on January 24, 2011, for follow up on his musculoskeletal complaints. Dr. Kieffer noted an MRI of the left shoulder yielded normal results with respect to the rotator cuff, but cystic arthritic change was noted. Dr. Kieffer diagnosed plaintiff with osteoarthritis of the shoulder and subacromial bursitis. Plaintiff was instructed to engage in regular exercise. (Tr. 408-09.)

Plaintiff returned to Dr. Brody on April 5, 2011, and continued to report no fatigue or lethargy. Dr. Brody noted plaintiff's current medications to include Levothyroxine, Naproxen, and Vicodin. Plaintiff reported having pain in his left shoulder and right ankle. Plaintiff was noted to have poor exercise habits. Examination showed enlarged thyroid but was otherwise normal. Plaintiff was diagnosed with hypothyroidism and Hashimoto's thyroiditis. Plaintiff was instructed to continue on his current medication regimen and to return in three months. (Tr. 400-02.)

Plaintiff visited Dr. Kieffer on May 18, 2011, and reported that pain was traveling to both hands from his shoulders. Examination of the hands showed motion to be abnormal with pain. Plaintiff also exhibited weakness of the hands.

Dr. Kieffer diagnosed plaintiff with arthritis, osteoarthritis, osteoarthritis of the shoulder, and rotator cuff sprain (capsule). Naprosyn was prescribed for the shoulder. (Tr. 393-94.)

Plaintiff visited Dr. Terri C. Coble at MDHC on August 3, 2011, for follow up of his musculoskeletal complaints. Plaintiff reported having continued pain in his hands and left shoulder with increased pain in his right ankle. Plaintiff reported his current pain to be at a level six. Plaintiff reported that he obtained relief with medications. Dr. Coble noted plaintiff's current medications to include Levothyroxine and Vicodin. Examination showed the right ankle to be very tender over the medial malleolus with mild edema noted over the lateral aspect. Pes planus was noted. Dr. Coble's diagnoses included arthropathy of multiple sites. An x-ray of the right ankle showed no evidence of arthritis or osteoarthritis. A prominent flat bone spur was noted over the dorsal aspect of the head of the talus. Laboratory tests were ordered, and plaintiff was instructed to follow up in three months. (Tr. 388-91.)

Plaintiff visited Dr. Brody on August 4, 2011, who noted plaintiff not to complain of fatigue or of tiring easily. Plaintiff was noted to have poor exercise habits. Plaintiff was continued on his medication regimen and was instructed to return in four months. (Tr. 382-84.)

Plaintiff returned to Dr. Brody on November 3, 2011, who noted there to be

no change from plaintiff's previous visit.  Plaintiff was continued on his medication regimen and was instructed to return in three months.  (Tr. 377-79.)

On November 28, 2011, plaintiff underwent a consultative physical examination for disability determinations.  Plaintiff reported to Dr. Charles Mannis, an orthopedic surgeon, that he currently had problems with his left shoulder, right ankle, and hands.  Plaintiff reported that, for several years, he has lost movement of his left arm and that his left arm and hand become numb at times.  Plaintiff reported that taking Naproxen and hydrocodone help to some degree.  Plaintiff reported that he was starting to have problems with his right shoulder.  With respect to his ankle, plaintiff reported that he has difficulty walking any distance and cannot stand for very long.  About eight months prior, plaintiff began using a cane that a friend had given him.  Plaintiff reported that he can sit thirty to sixty minutes.  Plaintiff reported that his hands get sore, especially along the top, and that he was told he had arthritis.  Plaintiff also reported occasional tingling in his left arm and hand once or twice a week.  Plaintiff reported that he does not lift things because his hands feel as if they have no strength.  Dr. Mannis observed plaintiff to be muscular in build and to be able to dress and undress without assistance.  Plaintiff was able to get up from a chair and from the examination table without assistance.  Dr. Mannis noted plaintiff to have an unusual gait and that he used the cane in an irregular manner by alternating its use

with either foot.  Plaintiff was unable to stand on his heels or toes.  Plaintiff was able to squat to forty-five degrees with complaints of ankle pain.  Range of motion showed a very slight restriction of the left shoulder, particularly with internal rotation.  Plaintiff made complaints with abduction and forward flexion bilaterally.  Tenderness about the left shoulder was noted to be relatively diffuse.  Full range of motion was noted about the elbows, hands, and wrists bilaterally.  Plaintiff could fully flex and extend his fingers, but some difficulty was noted with opposing his thumb to the lesser fingers.  Grip strength was 4/5, but Dr. Mannis noted plaintiff to exhibit only fair effort.  Diffused decreased sensation was noted to pinprick about the right hand.  Right ankle motion was noted to be limited with tenderness along the lateral side.  Plaintiff had complete range of motion about the hips and knees.  Straight leg raising was negative.  Dr. Mannis diagnosed plaintiff with right ankle pain with mild degenerative arthritis and spurring; tendonitis with possible loose body of the left shoulder; and bilateral hand pain, right greater than left.  (Tr. 482-84, 491-92.)  Dr. Mannis noted plaintiff's complaints to appear "somewhat disproportionate to the lack of actual objective physical findings noted."  (Tr. 484.)

In a Medical Source Statement (MSS) of Ability to Do Work-Related Activities completed that same date, Dr. Mannis opined that plaintiff could frequently lift and carry up to ten pounds and occasionally lift and carry up to twenty pounds.  Dr. Mannis further opined that plaintiff could sit for thirty minutes

at one time and for a total of six hours in an eight-hour workday; could stand for ten minutes at one time and for a total of one hour in an eight-hour workday; and walk for ten minutes at one time and for a total of one hour in an eight-hour workday. Dr. Mannis noted that the use of a cane was not medically necessary but that plaintiff could nevertheless carry small objects with his free hand if he were to use a cane. With respect to use of the hands, Dr. Mannis opined that, with his right hand, plaintiff could frequently reach overhead; frequently engage in all other reaching; and frequently handle, finger, feel, push, and pull. Dr. Mannis opined that, with his left hand, plaintiff could occasionally reach overhead; occasionally engage in all other reaching; and frequently handle, finger, feel, push, and pull. Dr. Mannis opined that plaintiff could occasionally operate foot controls with his right foot, and frequently operate foot controls with his left foot. Dr. Mannis opined that plaintiff should never climb stairs, ramps, ladders, or scaffolds and should be limited to only occasional balancing, stooping, kneeling, crouching, and crawling. Dr. Mannis further opined that plaintiff should never be exposed to unprotected heights and should be limited to only occasional exposure to moving mechanical parts and operating a motor vehicle. Finally, Dr. Mannis opined that plaintiff could shop; travel without a companion; ambulate without use of a wheelchair, two canes, or two crutches; walk a block at a reasonable pace on rough or uneven surfaces; use public transportation; climb a few steps at a reasonable

pace with use of a handrail; prepare a simple meal and feed himself; care for personal hygiene; and sort, handle, or use paper and/or files. Dr. Mannis opined that the limitations as described will last for twelve consecutive months but noted that the onset date of such limitations was undetermined. (Tr. 485-90.)

## IV. Relevant Medical Evidence Considered by the Appeals Council[4]

Plaintiff visited Dr. Coble on February 10, 2012, and reported no new complaints. Dr. Coble noted plaintiff's current medications to include Levothyroxine and Naprosyn. Musculoskeletal examination showed cracking of the left shoulder with decreased range of motion and pain. Plaintiff was prescribed Vicodin for general osteoarthritis. Plaintiff was instructed to continue on his other medications. Plaintiff was instructed to follow up with his specialists in orthopedics and endocrinology. (Tr. 511-13.)

In a letter dated April 17, 2012, and addressed to "To whom it may concern," Dr. Brody wrote that plaintiff's thyroid condition improved in 2011 but that he currently had become hypothyroid again despite taking medication. "He tires easily [and] has fatigue, sleep problems, anxiety and depression and palpatations [sic] now." Dr. Brody wrote that plaintiff's thyroid medication

---

[4] In determining plaintiff's request to review the ALJ's decision, the Appeals Council considered additional evidence that was not before the ALJ at the time of his decision. The Court must consider this evidence in determining whether the ALJ's decision was supported by substantial evidence. *Frankl v. Shalala*, 47 F.3d 935, 939 (8th Cir. 1995); *Richmond v. Shalala*, 23 F.3d 1441, 1444 (8th Cir. 1994).

required changes and that he anticipated that plaintiff would have problems in the future and would continue to have symptoms. Dr. Brody also wrote that plaintiff was under the care of Dr. Coble for arthritis. (Tr. 493.)

## V. The ALJ's Decision

The ALJ found plaintiff to meet the insured status requirements of the Social Security Act through December 31, 2014, and not to have engaged in substantial gainful activity since June 29, 2010, the amended alleged onset date of disability. The ALJ found plaintiff's tendonitis with possible loose body of the left shoulder; right ankle pain with mild degenerative arthritis and spurring; bilateral hand pain, right greater than left; and hypothyroidism to be severe impairments but that they did not meet or medically equal the severity of an impairment listed in 20 C.F.R. Part 404, Subpart P, Appendix 1. (Tr. 57-58.) The ALJ found plaintiff to have the RFC to perform light work[5] except that he could engage in "no overhead lifting with the non-dominant left upper extremity." (Tr. 58.) The ALJ found plaintiff unable to perform his past relevant work. Considering plaintiff's age, education, work experience, and RFC, the ALJ determined vocational expert testimony to support a finding that plaintiff could perform other work existing in significant numbers in the national economy, and specifically, light work in housekeeping and

_____

[5] Light work "involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds. . . . [A] job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls." 20 C.F.R. §§ 404.1567(b), 416.967(b).

as an information clerk, storage facility rental clerk, office helper, furniture rental clerk, and tanning salon attendant; and sedentary work as a call out operator and surveillance system monitor. The ALJ thus found that plaintiff was not under a disability from June 29, 2010, through the date of the decision. (Tr. 64-66.)

## VI. Discussion

To be eligible for DIB and SSI under the Social Security Act, plaintiff must prove that he is disabled. *Pearsall v. Massanari*, 274 F.3d 1211, 1217 (8th Cir. 2001); *Baker v. Secretary of Health & Human Servs.,* 955 F.2d 552, 555 (8th Cir. 1992). The Social Security Act defines disability as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A). An individual will be declared disabled "only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy." 42 U.S.C. §§ 423(d)(2)(A), 1382c(a)(3)(B).

To determine whether a claimant is disabled, the Commissioner engages in a five-step evaluation process. *See* 20 C.F.R. §§ 404.1520, 416.920; *Bowen v.*

*Yuckert*, 482 U.S. 137, 140-42 (1987). Step 1 considers whether the claimant is engaged in substantial gainful activity. If so, disability benefits are denied. At Step 2, the Commissioner decides whether the claimant has a "severe" medically determinable impairment or combination of impairments, meaning that which significantly limits his ability to do basic work activities. If the claimant's impairment(s) is not severe, then he is not disabled. If the impairment(s) is severe, the Commissioner then determines at Step 3 whether such impairment(s) is equivalent to one of the impairments listed in 20 C.F.R., Part 404, Subpart P, Appendix 1. If claimant's impairment(s) meets or equals one of the listed impairments, he is conclusively disabled. At Step 4, the Commissioner establishes whether the claimant's impairment(s) prevents him from performing his past relevant work. If the claimant can perform such work, he is not disabled. Finally, if the claimant is unable to perform his past work, the Commissioner continues to Step 5 and evaluates various factors to determine whether the claimant is capable of performing any other work in the economy. The claimant is entitled to disability benefits only if he is not able to perform other work.

The decision of the Commissioner must be affirmed if it is supported by substantial evidence on the record as a whole. 42 U.S.C. § 405(g); *Richardson v. Perales*, 402 U.S. 389, 401 (1971); *Estes v. Barnhart*, 275 F.3d 722, 724 (8th Cir. 2002). Substantial evidence is less than a preponderance but enough that a

reasonable person would find it adequate to support the conclusion. *Johnson v. Apfel*, 240 F.3d 1145, 1147 (8th Cir. 2001). This "substantial evidence test," however, is "more than a mere search of the record for evidence supporting the Commissioner's findings." *Coleman v. Astrue*, 498 F.3d 767, 770 (8th Cir. 2007) (internal quotation marks and citation omitted). "Substantial evidence on the record as a whole . . . requires a more scrutinizing analysis." *Id.* (internal quotation marks and citations omitted).

To determine whether the Commissioner's decision is supported by substantial evidence on the record as a whole, the Court must review the entire administrative record and consider:

1.  The credibility findings made by the ALJ.

2.  The plaintiff's vocational factors.

3.  The medical evidence from treating and consulting physicians.

4.  The plaintiff's subjective complaints relating to exertional and non-exertional activities and impairments.

5.  Any corroboration by third parties of the plaintiff's impairments.

6.  The testimony of vocational experts when required which is based upon a proper hypothetical question which sets forth the claimant's impairment.

*Stewart v. Secretary of Health & Human Servs.,* 957 F.2d 581, 585-86 (8th Cir. 1992) (internal citations omitted). The Court must also consider any evidence

which fairly detracts from the Commissioner's decision. *Coleman*, 498 F.3d at 770; *Warburton v. Apfel*, 188 F.3d 1047, 1050 (8th Cir. 1999). "If, after reviewing the entire record, it is possible to draw two inconsistent positions, and the Commissioner has adopted one of those positions," the Commissioner's decision must be affirmed. *Anderson v. Astrue*, 696 F.3d 790, 793 (8th Cir. 2012). The decision may not be reversed merely because substantial evidence could also support a contrary outcome. *Young v. Apfel*, 221 F.3d 1065, 1068 (8th Cir. 2000).

In this cause, plaintiff raises numerous challenges to the manner and method by which the ALJ determined his RFC. Because it cannot be said that substantial evidence on the record as a whole supports the ALJ's finding that plaintiff can perform work with his RFC, the matter will be remanded for further proceedings.

Plaintiff contends that the vocational expert's testimony regarding the range of light work that he could perform is incompatible with the limitations set out in the only medical opinion evidence of record – that is, the MSS completed by Dr. Mannis – inasmuch as Dr. Mannis described limitations most compatible with the performance of sedentary work. Plaintiff argues that the expert's testimony is especially incompatible given plaintiff's limitations in his upper extremities, even with the performance of sedentary work. (*See* Pltf.'s Brief, Doc, #20 at p. 7.) Plaintiff's argument is well taken.

With respect to Dr. Mannis's November 2011 MSS, the ALJ determined to

accord some weight to the opinions expressed therein but appeared to discount his opinions with respect to plaintiff's manipulative limitations given the lack of findings in the record as a whole regarding plaintiff's hand pain and inability to grasp and grip. (*See* Tr. 64.) The ALJ also appeared to discount Dr. Mannis's opinions regarding plaintiff's limited ability to stand or walk given that the medical record showed that plaintiff did not follow up on recommended treatment for his foot and ankle conditions by failing to exercise and undergo further examination and fitting for orthotics. (*Id.*) Because Dr. Mannis did not have the opportunity to assess plaintiff when he was following a recommended treatment plan regarding his foot and ankle impairments, the ALJ did not err in discounting the opined limitations relating thereto. *Bernard v. Colvin*, 774 F.3d 482, 488 (8th Cir. 2014). *See also Wildman v. Astrue*, 596 F.3d 959, 964 (8th Cir. 2010) (ALJ may discount physician's opinion if physician failed to take noncompliance into account). Nevertheless, in his written decision, the ALJ's RFC assessment included a limitation that plaintiff could engage in "no overhead lifting with the non-dominant left upper extremity." (Tr. 58.) This limitation, however, was never included in any hypothetical question posed to the vocational expert. Because the ALJ's finding of non-disability was based on vocational expert testimony given in response to incomplete hypotheticals, the ALJ erred in relying on such testimony to deny plaintiff's disability claims.

"The Commissioner may rely on a vocational expert's response to a properly formulated hypothetical question to show that jobs that a person with the claimant's RFC can perform exist in significant numbers." *Guilliams v. Barnhart,* 393 F.3d 798, 804 (8th Cir. 2005).  A vocational expert's testimony that is based on a hypothetical question that does not encompass all relevant effects of a claimant's impairments cannot constitute substantial evidence to support an ALJ's decision. *Jones v. Astrue*, 619 F.3d 963, 972 (8th Cir. 2010); *Renstrom v. Astrue*, 680 F.3d 1057, 1067 (8th Cir. 2012).  While the hypothetical question need not contain a description of the claimant's impairments in diagnostic terms, it must "capture the concrete consequences" of the impairments.  *Lacroix v. Barnhart,* 465 F.3d 881, 889 (8th Cir. 2006); *see also Renstrom*, 680 F.3d at 1067.

Here, the ALJ's written decision included an RFC finding that plaintiff could engage in no overhead lifting with his left arm.  No hypothetical question posed to the vocational expert contained this limitation.  Because the ALJ included this limitation his written RFC findings, the vocational expert should have been required to provide testimony regarding the extent to which the occupational base was reduced thereby.  *Cf. Jones*, 619 F.3d at 976-78 (noting expert testified that number of occupations would be reduced by ten to fifteen percent because of claimant's limitation to occasional handling).  Because the vocational expert was not given this opportunity, it cannot be said that the ALJ's reliance on the expert's

testimony to find plaintiff not disabled is supported by substantial evidence inasmuch as no hypothetical posed to the expert contained all of plaintiff's limitations as found by the ALJ in his RFC determination. The matter must therefore be remanded for a proper hypothetical to be posed to an expert.

Upon remand, the ALJ shall also reassess plaintiff's RFC in view of Dr. Brody's April 2012 letter – which was considered by the Appeals Council after the ALJ's decision – in which he wrote that plaintiff tires easily and has fatigue and sleep problems. To provide the ALJ an opportunity to consider this evidence is especially significant here given that the ALJ discredited plaintiff's complaints of fatigue because of Dr. Brody's earlier findings that plaintiff experienced no fatigue or lethargy. The ALJ also appeared to generally discredit plaintiff's complaints relating to his thyroid condition, finding the evidence to show the impairment to be controlled with medication. (Tr. 63.) Dr. Brody's April 2012 letter states, however, that plaintiff experienced a recurrence of hypothyroidism in 2012 despite medication compliance, and would continue to experience related symptoms.

In conjunction with the reassessment of plaintiff's RFC, the ALJ shall also reassess plaintiff's credibility upon remand. *Wagner v. Astrue*, 499 F.3d 842, 851 (8th Cir. 2007) (before determining claimant's RFC, ALJ must evaluate claimant's credibility). Such reassessment is necessary here, not only because of the significance of Dr. Brody's 2012 letter as it relates to plaintiff's subjective

complaints, but also because of the ALJ's flawed credibility analysis in his decision as it now stands.

In determining the credibility of a claimant's subjective complaints, the ALJ is required to consider evidence of the claimant's prior work record and third party observations as to the claimant's daily activities; the duration, frequency and intensity of the symptoms; any precipitating and aggravating factors; the dosage, effectiveness and side effects of medication; and any functional restrictions. *Polaski v. Heckler*, 739 F.2d 1320, 1322 (8th Cir. 1984) (subsequent history omitted). When rejecting subjective complaints, the ALJ must make an express credibility determination detailing his reasons for discrediting the claimant's testimony. *Renstrom,* 680 F.3d at 1066; *Cline v. Sullivan*, 939 F.2d 560, 565 (8th Cir. 1991). Where, as here, alleged inconsistencies upon which an ALJ relies to discredit a claimant's subjective complaints are not supported by and indeed are contrary to the record, the ALJ's ultimate conclusion that the claimant's symptoms are less severe than he claims is undermined. *Baumgarten v. Chater*, 75 F.3d 366, 368-69 (8th Cir. 1996).

In this case, the ALJ improperly considered plaintiff's application for and receipt of unemployment benefits as a factor weighing against his credibility. While accepting unemployment benefits entails an assertion of an ability to work and is inconsistent with a claim of disability, *Cox v. Apfel*, 160 F.3d 1203, 1208

(8th Cir. 1998), a review of the record here shows plaintiff to have last received unemployment benefits during the first quarter of 2010. Plaintiff alleges a disability onset date of June 29, 2010. As such, it cannot be said that plaintiff's acceptance of unemployment benefits prior to the time he claimed he was disabled is inconsistent with subsequent complaints of symptoms giving rise to disability. *Cf. Barrett v. Shalala*, 38 F.3d 1019, 1024 (8th Cir. 1994) (statement made for unemployment benefits that claimant is capable of working inconsistent with claim of disability *during same period*).

The ALJ also determined to discredit plaintiff's complaints of pain finding that plaintiff took only over-the-counter pain medication. (*See* Tr. 62-63.) A review of the record shows, however, that plaintiff was prescribed significant pain medication for his musculoskeletal conditions at various times throughout the relevant period, with such medication including Tramadol and Vicodin.[6] The ALJ's statement that plaintiff took only over-the-counter pain medication is contrary to the record.

Further, the undersigned notes that the ALJ repeatedly referred to "gaps" in plaintiff's treatment – and specifically between May 2009 and January 2010 for his thyroid condition, and between February 2010 and July 2010 for his shoulder

---

[6] The undersigned questions the ALJ's basis for finding that plaintiff took only over-the-counter medication given that he earlier referred to plaintiff being prescribed Tramadol for pain. (*See* Tr. 61.)

condition – inferring that these "gaps" in treatment were inconsistent with complaints of ongoing, disabling symptoms.  (Tr. 60-61.)  These perceived gaps, however, occurred prior to the date plaintiff claimed he became disabled, that is, June 29, 2010.  While an ALJ must consider all relevant medical evidence of record regardless of its date in determining a claimant's disability, it cannot be said that a claimant's failure to seek consistent treatment *prior to* his alleged onset date of disability serves to discredit his complaints of disabling symptoms experienced on or after such onset date.

Where alleged inconsistencies upon which an ALJ relies to discredit a claimant's subjective complaints are not supported by and indeed are contrary to the record, the ALJ's ultimate conclusion that the claimant's symptoms are less severe than he claims is undermined.  *Baumgarten,* 75 F.3d at 368-69.  Accordingly, because the ALJ's decision fails to demonstrate that he considered all of the evidence before him under the standards set out in *Polaski*, this cause should be remanded to the Commissioner for an appropriate analysis of plaintiff's credibility in the manner required by and for the reasons discussed in *Polaski*.

## VII.  Conclusion

Therefore, for all of the foregoing reasons, the Commissioner's adverse decision is not based upon substantial evidence on the record as a whole and the case shall be remanded to the Commissioner for further proceedings consistent

with this Memorandum and Order.

Accordingly,

**IT IS HEREBY ORDERED** that the decision of the Commissioner is

**REVERSED**, and this cause is **REMANDED** for further proceedings.

A separate Judgment in accordance with this Memorandum and Order is

entered this same date.


_____*Jerry J. Adelman*_____
UNITED STATES MAGISTRATE JUDGE


Dated this  31st  day of March, 2015.